**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JEWU RICHARDSON, | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:19-CV-00707 (JCH) |
| v. | : | |
| | : | |
| JAMES MCMAHON, et al., | : | |
| Defendant. | : | FEBRUARY 25, 2022 |
| | : | |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 53)**

**I.    INTRODUCTION**

Plaintiff Jewu Richardson brings this action pursuant to section 1983 of title 42 of
the United States Code against the City of Waterbury and three Waterbury Police
Department officers – James McMahon, Juan Rivera, and Edward Mills.  See Second
Am. Compl. at ¶¶ 2-3 ("Compl.") (Doc. No. 47).  He brings five separate Counts, alleging
false arrest in violation of the Fourth Amendment and Connecticut state law; malicious
prosecution in violation of the same; and a claim for municipal liability under section 52-
557n of the Connecticut General Statutes.  Id. at ¶¶ 25-32.

Defendants have moved for summary judgment on each of these Counts.  See
Defs.' Mot. for Summ. J. (Doc. No. 53); Defs.' Mem. of Law in Supp. of Mot. for Summ.
J. ("Defs.' Mem.") (Doc. No. 53-1); Defs.' Reply Mem. to Pl.'s Mem. of Law in Opp'n to
Defs.' Mot. for Summ. J. ("Defs.' Reply") (Doc. No. 55).  Richardson opposes this
Motion.  See Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") (Doc.
No. 54-1).

For the reasons discussed below, the Motion for Summary Judgment is granted.

II.   **FACTS**[1]

In the early morning hours of January 12, 2016, plaintiff Jewu Richardson called 911 twice.  Defs.' R. 56(a)1 Stmt at ¶ 6; Pl.'s R. 56(a)2 Stmt at ¶ 6.  Defendants McMahon and Rivera were working an overnight shift that evening and responded to the call.  Defs.' R. 56(a)1 Stmt at ¶¶ 3, 5; Pl.'s R. 56(a)2 Stmt at ¶¶ 3, 5.  When they arrived on the scene, they found Richardson standing outside.  Defs.' R. 56(a)1 Stmt at ¶ 7; Pl.'s R. 56(a)2 Stmt at ¶ 7.  He "had a laceration above his left eye about two inches long and was covered in blood."  Defs.' R. 56(a)1 Stmt at ¶ 8; Pl.'s R. 56(a)2 Stmt at ¶ 8.  He was also "holding a rag on the left side of his forehead and was bleeding profusely from that area."  Id.  According to Richardson, he had been assaulted by Candice Binns, a woman he was in an "off-and-on relationship with" at the time.  Dep. of Jewu Richardson at 22, 86 (Doc. No. 54-3).

The parties dispute what happened next. Richardson testified that "at least two" officers approached him and "tr[ied] to interview [him], but [that he] was losing a lot of blood and . . . falling in and out of consciousness."  Id. at 12, 17.  After he told the officers he was having difficulty responding to their questions because of his injuries, they "stopped the interview and called for medical attention."  Id. at 12-13.  Richardson was "dazed, [he] was lightheaded", and his "knees were turning into . . . water."  Id. at 13.  Although he was scared of losing consciousness, he still "tr[ied] [his] hardest to give them stuff" before "it became too overbearing."  Id. at 18.  In McMahon's Affidavit,

---

[1] The court draws the facts detailed here from the parties' Rule 56 statements and the exhibits attached therein.  See Defs.' Local R. 56(a)1 Statement of Facts ("Defs.' R. 56(a)1 Stmt") (Doc. No. 53-2); Pl.'s Local R. 56(a)2 Statement of Facts in Opp'n to Summ. J. ("Pl.'s R. 56(a)2 Stmt") (Doc. No. 54-2); Pl.'s Additional Material Facts (Doc. No. 54-2).  As it must, the court construes all disputed facts in the light most favorable to Richardson, the non-moving party.  It does, however, note where the parties disagree as to what happened.

however, he averred that, when he interviewed Richardson at the scene, Richardson

"stated [that] he [had] got[ten] into an argument with a woman at the residence", but

"refused" to respond to follow-up questions about what happened or to "give any more

information."  Defs.' Ex. E, Aff. of James McMahon, at ¶¶ 9-10 (Doc. No. 53-7).  In his

Affidavit, Rivera stated the same.[2]  Defs.' Ex. F, Aff. of Juan Rivera, Jr., at ¶¶ 9-10 (Doc.

No. 53-8).  The parties agree, however, the Richardson at least told the officers that he

was assaulted.  Defs.' R. 56(a)1 Stmt at ¶ 11; Pl.'s R. 56(a)2 Stmt at ¶ 11.

    Richardson testified that, after Binns assaulted him, she "left [the] residence, she

left because they thought they w[ere] going to arrest her."  Dep. of Jewu Richardson at

117.  This meant that "when the police came, she wasn't there", although her children

still were.  Id.  Similarly, Binns testified at Richardson's trial that "[she] left" after the

altercation with him because she "thought [she] was going to get in trouble."  Trial Day 2

Transcript at 142-43 (Doc. No. 54-5); see also Defs.' Ex. D, Statement of Candice

Binns, at 1-2 (Doc. No. 53-6) (stating that, after Richardson started choking her, she

defended herself by hitting him with a plate before hiding in the bathroom and then

leaving her house shortly afterwards because she was worried she might be arrested

for hitting him).  Both Richardson and Binns also seem to agree that the police officers

spoke with Binns' 15-year-old daughter just after they spoke with Richardson, during the

period when Binns was not present at the scene.  Richardson testified that he was "a

---

[2] The court notes that Rivera's testimony has been inconsistent as it pertains to what Richardson said at the scene.  In his deposition, he adamantly testified – after being asked twice – that he did not recall what Richardson had said.  See Dep. of Juan Rivera at 20-22 (Doc. No. 54-7).  Yet in his Affidavit signed a week later after his deposition, Rivera suddenly recalled these specific details of the conversation.  Because Rivera's testimony differs in this regard from Richardson's, given the summary judgment standard, the court accepts Richardson's version of what he told the officers at the scene for the purposes of this Motion.

million percent sure" that, before the ambulance arrived to take him to the hospital, he "[saw Binns'] daughter talking to the police."  Dep. of Jewu Richardson at 117-18. According to him, Binns' daughter was standing outside, which is where he saw her talking to the officers.  Id.  Binns' testimony is consistent with Richardson's in this regard: she testified that, before she returned to her residence, the officers "talked to [her] daughter first."  Trial Day 2 Transcript at 144.

    The defendants, however, have a different version of these events.  They say that Binns did not leave after the incident and, that after Richardson was taken to the hospital, McMahon "first met separately with [ ] Binns" before speaking with her daughter.  Aff. of James McMahon at ¶ 14 (emphasis added); see also Aff. of Juan Rivera, Jr. at ¶ 14.  McMahon testified in his deposition that Binns was in the kitchen when they arrived, and neither he nor Rivera were able to provide an explanation for why both she and Richardson testified that she had left.  Dep. of James McMahon at 18 (Doc. No. 54-6); Dep. of Juan Rivera at 15-16.  They also say – in contrast to both Richardson and Binns' testimony – that they interviewed Binns first, not her daughter.  Defs.' R. 56(a)1 Stmt at ¶ 20.  According to the defendants, Binns proceeded to tell McMahon that Richardson had assaulted her and that her daughter had witnessed the assault.[3] Defs.' R. 56(a)1 Stmt at ¶¶ 22-23.  Defendants also say that, "[a]fter speaking with [ ] Binns, McMahon spoke separately with her daughter . . . who stated she [had] heard a commotion in the kitchen and went to see what was going on."  Id. at ¶ 26. "[S]he saw [Richardson] choking her mother and pouring water on her face."  Id.

---

[3] Binns agrees that this is what she told the officers but she disputes the timing.  According to her statement, she had left the residence and only told the officers about the assault after they had already spoken with her daughter and she had returned.  Statement of Candice Binns at 2.

This account differs greatly from the testimony of Binns and Richardson. According to them, after Binns fled, the officers interviewed her daughter without Binns there.  Dep. of Jewu Richardson at 117-18; Trial Day 2 Transcript at 144.  Richardson testified that, before the ambulance arrived, he saw one of "the cop[s] pull out [a] phone and give it to" Binns' daughter.[4]  Dep. of Jewu Richardson at 119.  During the trial, Binns testified that her daughter then "called [her] and told [her] to come back, like it was okay, come back . . . . She called me and told me to come back."  Trial Day 2 Transcript at 143.[5]  It was only then that Binns returned to the apartment and told the officers that she had been assaulted by Richardson.  Statement of Candice Binns at 2.

Crucially, however, Ricahrdson has not pointed to any evidence in the record demonstrating that Binns' daughter told Binns about her statement to the police when Binns' daughter called Binns to tell her to come back, nor has Richardson pointed to any other evidence indicating that the testimony of Binns and her daughter the night of the incident was "coordinated" in any way.  Pl.'s Mem. at 1, 10 (arguing that Binns and her daughter gave "coordinated statements" to the police but citing no evidence in the record to support this claim); Pl.'s Additional Material Facts (also citing no evidence in the record indicating that the testimony was coordinated).  Richardson testified that he had already left in the ambulance by the time Binns returned, and that he could not really hear the substance of the conversation Binns' daughter had with Binns on the

---

[4] At trial, Binns' daughter did not recall many aspects of the night, including whether or not the police had given her a phone to call her mother.  She testified that "[i]t could be possible", but that she did not remember.  Trial Day 2 Transcript at 202.

[5] The court notes that Binns' trial testimony differed from what she provided in her statement.  At trial, she said it was her daughter who called her.  Id.  In her statement, she said it was "[t]he police."  Statement of Candice Binns at 2.

phone beyond her telling Binns to return to the residence.  Dep. of Jewu Richardson at 119-20.  According to Binns at the trial, she returned and talked to the police officers. Trial Day 2 Transcript at 145.  But plaintiff does not point to any evidence in the record demonstrating that she was privy to what her daughter had already told them when she gave her statement to the officers.

The parties agree, however, that after both Binns and her daughter gave their statements to McMahon, "Officer McMahon determined there was probable cause to place [ ] Richardson under arrest."  Defs.' R. 56(a)1 Stmt at ¶ 35.  They disagree on what Officer McMahon relied on to reach that conclusion.  At his deposition, McMahon was asked what probable cause was.  He replied that "[p]robable cause is – wow. Drawing a blank right now", before following that answer up later by clarifying that "[p]robable cause is, like, the reasonable grounds for any searches for placing charges on somebody."  Dep. of James McMahon at 13-14.  He also stated that the probable cause in this case to arrest Richardson was "[t]he statements given by [Binns] and her daughter."  Id. at 13.  Richardson also emphasizes that, while he told the officers that he was assaulted and "was bleeding profusely" from "a large laceration above [his] left eye", Binns had no observable marks or injuries.  Defs.' Ex. B, Waterbury Police Department Case Report at 1 ("Police Report") (Doc. No. 53-4).  In contrast, defendants point to McMahon's observation "that the apartment was a mess", along with the fact that Binns was wet and disheveled.  Defs.' R. 56(a)1 Stmt at ¶¶ 31-34.

Regardless, after determining there was probable cause to arrest Richardson, McMahon "then radioed that [he] should [ ] be placed under arrest."  Aff. of James McMahon at ¶ 26.  At this point, Richardson had been transported to the hospital

because of his injuries.  Defs.' R. 56(a)1 Stmt at ¶ 15; Pl.'s R. 56(a)2 Stmt at ¶ 15.  After

McMahon concluded that there was probable cause to arrest him, however, Richardson

was handcuffed by the officer assigned to guard him at the hospital.  Defs.' R. 56(a)1

Stmt at ¶¶ 39-41; Pl.'s R. 56(a)2 Stmt at ¶¶ 39-41.  Immediately after leaving Binns'

residence, McMahon completed a Case Report on the incident, in accordance with

Waterbury Police Department policies and procedures.  See Police Report; Defs.' R.

56(a)1 Stmt at ¶ 43; Pl.'s R. 56(a)2 Stmt at ¶ 43.

Richardson posted bond during the afternoon of January 12.  Defs.' R. 56(a)1

Stmt at ¶ 45; Pl.'s R. 56(a)2 Stmt at ¶ 45.  That same afternoon, he went to the

Waterbury Police Department, hoping to talk to the arresting officers about the incident

and provide them with more information they did not know about.  Id.  When he arrived,

however, they were no longer there.  Id.  Undeterred, he returned every day thereafter

until he was able to speak with one of the arresting officers.  Defs.' R. 56(a)1 Stmt at ¶

46; Pl.'s R. 56(a)2 Stmt at ¶ 46.  Although Richardson did not recall the name of the

Officer he spoke with, McMahon stated in his Affidavit that "a couple of days after the

incident" he spoke with Richardson in the lobby of the Police Department.  Aff. of James

McMahon at ¶ 31.  "At that time, [ ] Richardson told [McMahon] his version of the

incident" – i.e., that was Binns that had assaulted him.  Id.  McMahon responded by

saying that, "since he was arrested [Richardson] would have to speak with a detective

to formally give his version of the events."  Id.  According to Richardson, the arresting

officer with whom he spoke also told him that, "at the very minimum[,] they would have

arrested both [him] and Binns just to make sure, just to [finish] things out.  The best

case scenario was they both would have gotten arrested."  Defs.' R. 56(a)1 Stmt at ¶ 48; Pl.'s R. 56(a)2 Stmt at ¶ 48.

Following the officer's advice, Richardson proceeded to set up an appointment to meet with a detective.  Defs.' R. 56(a)1 Stmt at ¶ 49; Pl.'s R. 56(a)2 Stmt at ¶ 49.  That detective was defendant Mills.  Id.  During their meeting, Richardson asked Mills to investigate the allegations against him further, to which Mills replied that the incident would be investigated, and that the Police Department would then provide the information they gathered to the prosecutor.  Defs.' R. 56(a)1 Stmt at ¶¶ 50-51; Pl.'s R. 56(a)2 Stmt at ¶¶ 50-51.  Richardson also provided a sworn statement, reiterated his side of the story to Mills, and stated that what Binns and her daughter had told the police was false.  Defs.' R. 56(a)1 Stmt at ¶ 52; Pl.'s R. 56(a)2 Stmt at ¶ 52; Defs.' Ex. C, Statement of Jewu Richardson (Doc. No. 53-5).

After speaking with Richardson, Mills began an investigation based on his statement.  Defs.' R. 56(a)1 Stmt at ¶ 54; Pl.'s R. 56(a)2 Stmt at ¶ 54.  As part of the investigation, he reviewed the Case Report McMahon had prepared the night of the incident.  Id.  He also contacted Binns and, ten days after he had met with Richardson, met with her personally to take her sworn statement.  Defs.' R. 56(a)1 Stmt at ¶ 55; Pl.'s R. 56(a)2 Stmt at ¶ 55.  Her statement, of course, conflicted with Richardson's statement and, following his investigation, Mills "concluded that the issue of how to proceed should be determined by the state's attorney's office."  Defs.' R. 56(a)1 Stmt at ¶ 56; Pl.'s R. 56(a)2 Stmt at ¶ 56.  During the investigation, however, Mills did not listen to the 911 calls from Richardson; did not take a statement from Binns' daughter; and did not take any investigative action beyond securing the sworn statements of Richardson

and Binns and forwarding them along to the state's attorney's office, which already had the Case Report.  Dep. of Edward Mills at 10, 21-22, 26 (Doc. No. 54-8).  The state's attorney's office continued to prosecute Richardson.  Defs.' R. 56(a)1 Stmt at ¶ 58; Pl.'s R. 56(a)2 Stmt at ¶ 58.  Richardson was ultimately found not guilty following a trial by jury in 2018.  Id.

## III.   STANDARD OF REVIEW

A Motion for Summary Judgment will be granted if the record shows "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact.  Celotex Corp. v. Cartrett, 477 U.S. 317, 323 (1986).  The non-moving party may defeat the motion by producing sufficient specific evidence to establish that there is a genuine issue of material fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  A genuine issue of material fact exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor.  See, e.g., Biondo v. Kaledia Health, 935 F.3d 68, 73 (2d Cir. 2019) (citing Anderson, 477 U.S. at 248)).

## IV.   DISCUSSION

Based on these events, Richardson has brought five claims against the City of Waterbury and Officers McMahon, Rivera, and Mills.[6]  See Compl. at ¶¶ 25-32.  Counts One and Three are brought against McMahon and Rivera and allege false arrest in violation of the Fourth Amendment and Connecticut law.  Id. at ¶ 25, 27.  Counts Two

---

[6] In his First Amended Complaint, Richardson also brought a Monell claim against the City of Waterbury.  See Am. Compl. at ¶ 28 (Doc. No. 30).  However, the court dismissed that claim in its entirety in its Ruling on the Motion to Dismiss.  See Ruling on Mot. to Dismiss at 33-34 (Doc. No. 44).

and Four allege malicious prosecution in violation of the same and are brought against McMahon, Rivera, and Mills.  Id. at ¶ 26, 28.  Count Five is brought against the City of Waterbury, asserting a claim for municipal liability under section 52-557n of the Connecticut General Statutes .  Id. at ¶¶ 29-32.  The court analyzes each of these claims below.[7]

A.    False Arrest and Malicious Prosecution

In Connecticut, claims for false arrest and malicious prosecution include similar elements.  Francois v. Norwalk Police Dept., No. FSTCV155014644S, 2017 WL 811602, at *2 (Conn. Super. Ct. Jan. 27, 2017).[8]  "To prevail on a claim of false arrest" in Connecticut, "a plaintiff must show that (1) the defendant intentionally arrested him [or her], or had him [or her] arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent to the arrest; and (4) the arrest was not supported by probable cause." Conroy v. Caron, 275 F. Supp. 3d 328, 348 (D. Conn. 2017) (internal quotations and citations omitted).  In the false arrest context, "[t]he probable cause inquiry is based

---

[7] As the court noted in its Ruling on the Motion to Dismiss, "[t]he Second Circuit has instructed that courts should 'generally look[ ] to the law of the state in which the arrest occurred' to determine the elements of claims for false arrest, in violation of the Fourth Amendment, brought under section 1983." Ruling on Mot. to Dismiss at 11 n. 2 (quoting Davis v. Rodriguez, 364 F.3d 424, 433 (2d Cir. 2004)).  The same is true of a malicious prosecution claim.  Id.  As such, the court addresses both of Richardson's false arrest and malicious prosecution claims together, and its "analyses of the elements of [his] false arrest and malicious prosecution claims apply equally to his claims under the Fourth Amendment to the U.S. Constitution and his claims under Connecticut law."  Id.

[8] The court notes that Connecticut and New York law are similar as to the probable cause element of false arrest and malicious prosecution claims.  See, e.g., Clynch v. Chapman, 285 F. Supp. 2d 213, 225 n. 15 (D. Conn. 2003) (noting the similarities between false arrest claims under Connecticut and New York law and concluding that the court "need not delve into any potential differences between [the two] . . . as defendants here challenge only plaintiff's ability to prove the prong of probable cause"); DeRafelo v. Littlejohn, No. 3:10-CV-207, 2012 WL 2459396, at *4 n. 10 (D. Conn. June 27, 2012) ("there does not appear to be any relevant distinction in the law of malicious prosecution in New York and Connecticut") (internal quotations and citations omitted).  Moreover, the parties do not appear to dispute these similarities, as they both rely heavily on cases applying New York law from courts in the Second Circuit throughout their Memoranda.

upon whether facts known by the arresting officer <u>at the time of the arrest</u> objectively provided probable cause to arrest." <u>Washington v. Dewey</u>, 433 F. Supp. 3d 334, 346 (D. Conn. 2020) (emphasis added) (internal quotations and citations omitted).

"Similarly, to prevail on a claim of malicious prosecution, a plaintiff must prove that he or she was subject to a Fourth Amendment seizure and also that "(1) the defendant initiated or continued criminal proceedings against the plaintiff; (2) the criminal proceeding terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice." <u>Conroy</u>, 275 F. Supp. 3d at 348. In the malicious prosecution context, "the Second Circuit has observed that '[t]he probable cause standard . . . is slightly higher than the standard for false arrest cases.'" Ruling on Mot. to Dismiss at 24 (quoting <u>Stansbury v. Wertman</u>, 721 F.3d 84, 95 (2d Cir. 2013)). In addition, "under Connecticut law, '[m]alice may be inferred from lack of probable cause.'" <u>Id.</u> at 32 (quoting <u>Stonick v. Delvecchio</u>, 438 F. Supp. 3d 154, 168 (D. Conn. 2020)).

Here, the linchpin of both of Richardson's claims is the probable cause element. Indeed, in their Memoranda, the parties focus entirely on this element when discussing both claims. That is not without good reason, as "[t]he existence of probable cause is a complete defense to claims for false arrest and malicious prosecution." <u>Conroy</u>, 275 F. Supp. 3d at 349. Below, the court first analyzes whether, taking the evidence in the light most favorable to Richardson, a reasonable jury could find that no probable cause existed at the time of his arrest, before doing the same as to his prosecution.

      1.      False Arrest – Probable Cause

First, the court concludes that Richardson has met his burden of coming forward with evidence upon which a reasonable jury could conclude that McMahon and Rivera lacked probable cause to initiate his arrest.[9]

As discussed above, "[a] court assessing probable cause 'must consider only those facts available to the officer[s] at the time of the arrest and immediately before.'" Ruling on Mot. to Dismiss at 21 (quoting Stansbury v. Wertman, 721 F.3d 84, 89 (2d Cir. 2013)).  "Probable cause for an arrest exists when a police officer 'has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed a crime.'"  Id.  "More specifically, probable cause exists if a law enforcement officer received [ ] information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity.  The reliability or veracity of the informant and the basis for the informant's knowledge are two important factors."  Betts v. Shearman, 751 F.3d 78, 82 (2d Cir. 2014).  However, "[t]here is no duty imposed on an arresting officer 'to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest.'"  Chahine v. City of New York, No. 19-CV-0276, 2020 WL 2555228, at *2 (S.D.N.Y. May 20, 2020) (quoting Jocks v. Tavernier, 316 F.3d

---

[9] Defendants argue that no cause of action exists against Officer Rivera here because "Officer McMahon was the investigating officer and it was he and he alone who made the decision to arrest [Richardson]", not Rivera.  Defs.' Mem. at 24.  This argument strains credibility.  Rivera, to be sure, does swear in his Affidavit that he had no involvement in the decision to arrest or prosecute Richardson, and that he was simply present on the scene while McMahon interviewed Binns and her daughter and had Richardson arrested.  See Aff. of Juan Rivera, Jr. at ¶ 18.  As plaintiff points out, however, this directly contradicts the testimony Rivera provided during Richardson's trial.  At that point, according to Rivera, he was involved in Richardson's arrest.  See Trial Day 1 Transcript at 77 (Rivera testifying that "we" – meaning McMahon and Rivera – "contacted the officer" at the hospital who was guarding Richardson and that "we placed [him] under arrest") (emphasis added).

128, 136 (2d Cir. 2003)).  Probable cause therefore "'does not necessarily disappear simply because an innocent explanation may be consistent with facts that an officer views as suspicious.'"  Id. (quoting Figueroa v. Mazza, 825 F.3d 89, 102 (2d Cir. 2016)).  Simply because an individual "insist[s] on his innocence" to an officer before or at the time of his arrest is, by itself, "of no moment" to the question of whether probable cause existed to support the arrest.  Reid v. Yisrael, No. 19-CV-1220, 2019 WL 2437848, at *2 (E.D.N.Y. June 10, 2019).

Using this standard, courts have clearly established two scenarios relevant here where an officer has probable cause to arrest an individual.  The first is when (1) a purported victim tells the officer that the individual in question assaulted them, and (2) the victim has "visible injuries" that corroborate their statement.  See Williams v. City of New York, No. 18-CV-921, 2021 WL 1224894, at *4 (E.D.N.Y. Mar. 31, 2021).  Second, an arresting officer also has probable cause when he or she is "advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime . . . absent circumstances that raise doubts as to the victim's veracity."  Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995) (emphasis added) (finding that officers "needed nothing further to lawfully arrest" the plaintiff when they arrived at a store after being called and were advised by two employees that the plaintiff had stolen items valued at $11.55 and one of the employees "signed a criminal information and a supporting deposition reciting his version of the incident"); see also Rheingold v. Harrison Town Police Dept., 568 F. Supp. 2d 384, 390 (S.D.N.Y. 2008) (finding probable cause where plaintiff's ex-wife had made a complaint to the police that plaintiff had violated a court order by returning their children twenty

minutes late); <u>Beinhorn v. Saraceno</u>, 23 Conn. App. 487, 488-92 (1990) (probable cause where the victim reported to the police that plaintiff had engaged in disorderly conduct, and the officer relied on that accusation along with his earlier observations of the plaintiff's activities at the store that were consistent with the accusation to arrest her).  "[T]he application of this rule", however, "is not limited to the formal filing of a written complaint."  <u>Stokes v. City of New York</u>, No. 05-CV-0007, 2007 WL 1300983, at *5 (E.D.N.Y. May 3, 2007).  Even when the purported victim has not signed any sworn statement, "the Second Circuit and other courts have found probable cause to exist where, in the absence of circumstances raising doubts as to the victim's veracity, the police received information directly from a purported victim of a crime without a formal written complaint."  <u>Id.</u>  Stated differently, "police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed."  <u>Martinez v. Simonetti</u>, 202 F.3d 625, 634 (2d Cir. 2000).

Richardson argues that neither of these standards are met here.  In particular, he emphasizes that circumstances did indeed exist to raise doubts as to the veracity of Binns' and her daughter's statements to the officers alleging that Richardson had assaulted her.  Pl.'s Mem. at 9-12.  In support of his argument, he points to the fact that it was he, not Binns, who called 911; he, not Binns, who was visibly injured; and he, not Binns, who first told the officers upon their arrival at the scene that he was the victim of an assault.  <u>Id.</u> at 9-10.  Richardson is correct to point out that, as is the case here, "[t]he most common situation in which" a victim's statement is insufficient to establish probable cause is "when there exists a prior relationship between the victim and the accused."  <u>Mistretta v. Prokesch</u>, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998).  Because

"such a relationship . . . [can] give[ ] rise to a motive for a false accusation . . . [a] complaint alone may not constitute probable cause; the officer may need to investigate further."  Id.  It is largely for this reason that, at the Motion to Dismiss stage, this court noted that "[t]he officers should have reasonably expected that both Binns and her daughter would be biased in favor of Binns", and concluded that "something beyond the[ir] coordinated statements . . . was required [to establish] probable cause" to arrest Richardson.  Ruling on Mot. to Dismiss at 22 (emphasis added).

However, following discovery and construing the facts in the light most favorable to Richardson, there is no evidence in the record upon which a reasonable juror could find that the statements from Binns and her daughter were coordinated.  In his Complaint, Richardson had alleged that, after the officers had interviewed Binns' daughter, they "allowed [her] to call her mother, update her mother about the statement made to police, and ask her to return to the scene to make a statement consistent with her own."  Compl. at ¶ 12 (emphasis added).  In other words, Richardson alleged that the officers had relied solely on the statements of Binns and her daughter to establish probable cause and, importantly, that those statements had been coordinated between the two of them.  At the summary judgment stage, however, Richardson has not brought forth any evidence that their statements were coordinated in any way.  See, supra, at 6 (reviewing the record before the court to conclude that "plaintiff [has] not point[ed] to any evidence in the record demonstrating that [Binns] was privy to what her daughter had already told them when she gave her statement to the officers").  That is sufficient to distinguish this case in a meaningful way from Bhatia v. Debek, 287 Conn. 397, 411 (2008), where the jury had found that a minor's witness testimony had been "coached."

See Ruling on Mot. to Dismiss at 22 (relying on Bhatia in part to conclude that "something beyond the coordinated statements of Binns and her daughter was required for probable cause").

That is not the end of the court's inquiry, however.  Even if the testimony of Binns and her daughter was not coordinated, Mistretta makes clear that, when "there exists a prior relationship between the [purported] victim and the accused . . . the complaint alone may not [be enough to] constitute probable cause; the officer may need to investigate further."  Mistretta, 5 F. Supp. 2d at 133.  And here, Richardson is correct to point out that a reasonable jury could conclude that circumstances existed that would raise significant doubts as to Binns' accusation.  To be sure, her testimony was corroborated at the scene by her daughter, but – construing the facts in the light most favorable to Richardson – the officers did not investigate beyond that; did not collect any physical evidence at the scene; and did not rely on anything beyond the testimony of Binns and her daughter to arrest Richardson.

Most importantly, the case report that McMahon filled out the night of the incident is explicit in noting that he "did not observe any marks or injuries on [Binns]."  Although the Second Circuit has been clear that a purported victim's accusation combined with visible injuries is sufficient to establish probable cause, lower courts have been reluctant to grant summary judgment for officers when the accusation was not supported by physical evidence and the existence of a prior relationship or other circumstances raised doubts as to the accusation.  Compare Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) (finding an officer "had a reasonable basis for believing there was probable cause" when a "visibly injured" correctional officer approached a police

office and told him the plaintiff had assaulted him, even though the plaintiff insisted that he was acting in self-defense); Ziming Shen v. City of New York, 725 F. App'x 7, 13 (2d Cir. 2018) (a victim's "report of assault to the authorities and his visible injuries at the time of the officers' arrival" matters not only in concluding there was probable cause to arrest, but also to prosecute thereafter); Moscoso v. City of New York, 92 F. Supp. 2d 310, 314 (S.D.N.Y. 2000) (probable cause existed when the arresting officer "knew that there had been a struggle over a hammer, that one man was severely injured, that the injured man claimed that the plaintiff assaulted him, and that plaintiff admitted as much, albeit with an explanation that suggested a defense"), with Sankar v. City of New York, 867 F. Supp. 2d 297, 306-07 (E.D.N.Y. 2012) (issue of material fact as to whether probable cause existed when, construing the facts in the light most favorable to the non-movant, the arresting officer "was aware of the contentious relationship that existed between [the accuser] and [the] plaintiff"; did not investigate further or "observe[ ] any injuries consistent with [the accuser's] claim that plaintiff [had] scalded her with hot water"; and relied solely on the accuser's allegations to support the arrest); Weaver v. City of New York, No. 13-CV-20, 2014 WL 950041, at *1-2, 5 (E.D.N.Y. Mar. 11, 2014) (denying Motion to Dismiss as to a false arrest claim where plaintiff had alleged that she was assaulted by her boyfriend, grabbed a stick to defend herself, but did not hit him, and the officers relied on his claim that she had to arrest her absent any visible injuries to the boyfriend).

Indeed, when assessing probable cause in circumstances where there is a prior relationship between the purported victim and the accused, courts in this Circuit often focus on whether or not the accuser had visible injuries to corroborate their allegations

of assault.  In "'he-said-she-said' assault matters, the Second Circuit routinely relies, in significant part, on the undisputed fact that prior to arrest, officers observed injuries consistent with a victim's complaint."  Sankar, 867 F. Supp. 2d at 307.  This principle was perhaps most stark in Weaver.  In that case, the court initially denied the Motion to Dismiss plaintiff's false arrest claim when she alleged her boyfriend had assaulted her; her injuries backed up that claim; she alleged she had grabbed a stick to defend herself but did not use it; and officers still relied on the boyfriend's statements, absent physical evidence, to arrest her.  Weaver, 2014 WL 950041, at 1-2, 5.  Yet when the defendants moved for summary judgment, the court granted their Motion.  See Memorandum & Order, Weaver v. City of New York et al., No. 13-CV-0020 (E.D.N.Y. Mar. 29, 2016) (Doc. No. 62).  The key fact that had changed was that the undisputed evidence brought forth into the record had made clear that the boyfriend's accusations – even if perhaps not fully credible given the broader circumstances of the case – were at least corroborated by his own injuries that the officers had observed on the scene.  At the summary judgment stage, plaintiff had "conced[ed] that [the boyfriend] had visible injuries when the police arrived", and "her account [did] not explain all of [his] apparent injuries."  Id. at 8.  That alone, coupled with his accusations against her, was sufficient to establish probable cause.  This remained true despite the credible and substantial evidence plaintiff had brought into the record that would permit a reasonable jury to conclude that she had acted in self-defense and that the boyfriend's account of the incident was false.  Id. at 9-11.  According to the Weaver court, "th[o]se points are insufficient to overturn probable cause", because "[a]lthough the police could have accepted [her] version of events" they "were not required" to do so.  Id. at 10-11.

Following discovery, the record before the court on summary judgment remains most analogous to the facts alleged in <u>Weaver</u> at the motion to dismiss stage. A reasonable jury could conclude that in the early morning hours of January 12, 2016, Richardson called 911 twice. When officers McMahon and Rivera arrived at the scene, they found him bleeding profusely from his head, disoriented, and in need of medical attention. At this point, Richardson testified that Binns had fled the scene. Richardson told the officers that he had been assaulted but, given his injuries, was unable to provide the officers with any further information. The officers proceeded to interview Binns' daughter and then, after she returned to the scene, Binns herself. Rather than investigate further – and despite the lack of any visible injuries to Binns to corroborate her story – the officers relied on those statements to arrest Richardson.

To be sure, a reasonable jury could also conclude differently. But at this stage, Richardson has met his burden of bringing forth admissible evidence to create a dispute of material facts as to whether Officers McMahon and Rivera had probable cause to initiate his arrest. In Connecticut, the "Supreme Court has instructed that [w]hether the facts are sufficient to establish the lack of probable cause is a question ultimately to be determined by the court, but when the facts themselves are disputed, the court may submit the issue of probable cause in the first instance to a jury as a mixed question of fact and law." <u>Giannamore v. Shevchuk</u>, 108 Conn. App. 303, 312 (2008) (internal quotations and citations omitted). The court concludes that this is the case here.

2.    False Arrest – Qualified Immunity

A finding that issues of disputed material facts exist as to whether there was probable cause to arrest Richardson does not, however, end the court's inquiry on his false arrest claims. The court must still grant summary judgment for McMahon and

Rivera on these counts if it finds on a record of undisputed material issues of fact, as a matter of law, that they are entitled to qualified immunity.

"Even when a government official has violated an individual's rights and would otherwise be liable under section 1983, '[q]ualified immunity shields [the] government official[ ] from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" Ruling on Mot. to Dismiss at 25 (quoting Bacon v. Phelps, 961 F.3d 533, 542 (2d Cir. 2020)).  "Thus, qualified immunity will protect a defendant from liability if (1) the defendant's 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known', or (2) 'it was "objectively reasonable" for [the defendant] to believe that his actions were lawful at the time of the challenged act.'"  Id. (quoting Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007)).

Of course, "'[t]here is no doubt that the right to be free from arrest without probable cause [is] clearly established."  Id. (quoting Jenkins, 478 F.3d at 87)).  In the context of a false arrest claim, therefore, "[a]n officer is entitled to qualified immunity from a claim for false arrest . . . if he or she had at least arguable probable cause to have made the arrest."  Conroy, 275 F. Supp. 3d at 349.  "[T]he Second Circuit has cautioned that '"arguable" probable cause should not be misunderstood to mean "almost" probable cause.'"  Ruling on Mot. to Dismiss at 26 (quoting Jenkins, 478 F.3d at 87)).  Thus, "arguable probable cause [exists] if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."

20

Conroy, 275 F. Supp. 3d at 349.  If "any reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, could have determined that the [arrest] was lawful", then an officer is entitled to qualified immunity on a false arrest claim.  Figueroa, 825 F.3d at 100 (emphasis in original).

The court here concludes that Officers McMahon and Rivera are entitled to qualified immunity on Richardson's false arrest claim.  This is for two reasons.  First, this court has already concluded that there are issues of disputed material fact as to whether there was probable cause to arrest Richardson.  That does not mean, however, that this is not a close question of law.  In both Sankar and Weaver (at the summary judgment stage), the court held that a genuine issue of material fact existed as to whether there was probable cause to arrest the plaintiff.  Crucially though, in both of those cases, the officers relied on only the testimony of the accuser, in the absence of physical evidence, to initiate the arrest.  That is not the case here.  Officers McMahon and Rivera did not rely solely on Binns' statement: they also had the statement of her daughter, who was an eyewitness to the alleged assault and corroborated Binns' side of the story.  To be sure, "[t]he officers should have reasonably expected that both Binns and her daughter would be biased in favor of Binns" and against Richardson.  Ruling on Mot. to Dismiss at 22.  Absent evidence in the record upon which a reasonable jury could conclude that the statements of Binns and her daughter were coordinated, however, the existence of two witness statement accusing Richardson of assault differentiates this case in a meaningful way from Sankar and Weaver.  In the face of two eyewitnesses accusing Richardson of assault, the court concludes that Officers McMahon and Rivera at least had "arguable" probable cause to arrest Richardson.

21

This conclusion is buttressed by the lack of clearly established law demonstrating that the statement of the purported victim <u>and</u> the statement of an eyewitness, even a biased one, are insufficient to overcome circumstances that raise doubt about those allegations and establish probable cause. "Official conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." <u>Terebesi v. Torreso</u>, 764 F.3d 217, 230 (2d Cir. 2014) (internal quotations and citations omitted). "To determine whether the relevant law was clearly established", courts in the Second Circuit "consider the specificity with which the right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." <u>Id.</u> at 231.

Richardson does not – and cannot – point to a Supreme Court or Second Circuit case holding that such a fact pattern (or an analogous one) falls short of probable cause. <u>See</u> Pl.'s Mem. at 16-18. Moreover, Richardson's argument that "the Second Circuit has long held that the right to be free from arrest without probable cause [is] clearly established'" fundamentally misunderstands the qualified immunity standard. Pl.'s Mem. at 17 (quoting <u>Jenkins</u>, 478 F.3d at 87). Generalized statements about constitutional rights are not the focus of a court's inquiry as to whether qualified immunity in appropriate: rather, "the clearly established right must be defined <u>with specificity</u>." <u>Vega v. Semple</u>, 963 F.3d 259, 275 (2d Cir. 2020) (internal quotations and citations omitted) (emphasis added). "Indeed, the Supreme Court [has] instruct[ed] courts that [t]he dispositive question is whether the violative nature of the <u>particular</u> conduct is clearly established." <u>Id.</u> (emphasis in original) (internal quotations and

citations omitted).  This means that the qualified immunity "inquiry must be undertaken

in light of the specific context of the case, not as a broad general proposition."  Id.

(emphasis added) (internal quotations and citations omitted).  Richardson fails to point

to any such Supreme Court or Second Circuit cases demonstrating that, in the specific

context of this case, there was clearly established law.

       Accordingly, the court finds that McMahon and Rivera are entitled to qualified

immunity on Richardson's false arrest claim.  The court therefore grants defendants'

Motion for Summary Judgment as to Count One and Count Three of the Complaint.

                3.      Malicious Prosecution

       As discussed above, supra Section IV.A, the elements of a malicious prosecution

claim in Connecticut are similar to a claim for false arrest.  It is for this reason that

courts in this District have observed that "false arrest and malicious prosecution claims

. . . are best addressed together because they turn on the same questions."  Miles v.

City of Hartford, 719 F. Supp. 2d 207, 212 (D. Conn. 2010).  Here, as with his false

arrest claims, the parties primarily argue that Richardson's malicious prosecution claims

turn on the existence – or lack thereof – of probable cause.

       Despite the similarities between the probable cause standard in the false arrest

and malicious prosecution contexts, there remain important differences.  As noted

above, "[t]he probable cause standard in the malicious prosecution context is slightly

higher than the standard for false arrest cases."  Stansbury, 721 F.3d at 95.  "The

determination of probable cause [also] . . . must be evaluated in light of the facts known

or believed at the time the prosecution is initiated, rather than at the time of the arrest."

Deanda v. Hicks, 137 F. Supp. 3d 543, 574 (S.D.N.Y. 2015) (internal quotations and

citations omitted).  The Second Circuit has thus described probable cause to prosecute

"as such facts and circumstances as would lead a reasonably prudent person to believe the [individual in question is] guilty." <u>Boyd v. City of New York</u>, 336 F.3d 72, 76 (2d Cir. 2003). As with claims for false arrest, "[t]he existence of probable cause is a complete defense to claims for . . . malicious prosecution." <u>Conroy</u>, 275 F. Supp. 3d at 349. In addition, the standard for qualified immunity in the malicious prosecution context is similar to the standard for qualified immunity in the false arrest one: "an officer is entitled to qualified immunity . . . if he or she had at least <u>arguable</u> probable cause to have . . . initiated and maintained a prosecution." <u>Id.</u>

The court concludes that McMahon, Rivera, and Mills are entitled to qualified immunity as to Richardson's malicious prosecution claims. "Arguable probable cause to charge exists if there was arguable probable cause to <u>arrest</u> the plaintiff for the crimes in question, and no new information learned subsequent to [the] arrest made it manifestly unreasonable for the defendant officer to charge the plaintiff[ ] with [those crimes]." <u>Tompkins v. City of New York</u>, 50 F. Supp. 3d 426, 435 (S.D.N.Y. 2014) (emphasis added) (internal quotations and citations omitted); <u>see also</u> <u>T.R. by and through Yon-Rawls v. City of New York</u>, No. Civ. 7582, 2018 WL 3962830, at *9, *9 n. 8 (S.D.N.Y. Aug. 16, 2018) (finding that because probable cause to arrest existed and no subsequent "facts came to light prior to plaintiff being charged [with a crime] that would undermine that finding", the officers had probable cause in the context of plaintiff's malicious prosecution claim as well, but noting that "[e]ven assuming, <u>arguendo</u>, [that the officers] had only <u>arguable</u> probable cause to arrest plaintiff, they would still be entitled to qualified immunity with respect to plaintiff's malicious prosecution claim for the same reason") (emphasis added).

24

The court has already held that, construing the facts in the light most favorable to Richardson, McMahon and Rivera had arguable probable cause to initiate his arrest. Because no new facts came to light after his arrest that would undermine that conclusion, the defendant officers are also entitled to qualified immunity on Richardson's malicious prosecution claims.  It is undisputed that both McMahon and Rivera initiated Richardson's arrest after taking statements at the scene from his accuser – Binns – and an eyewitness to the alleged assault – Binns' daughter.  To be sure, Richardson also testified that he told the officers at the scene that it was him who had been assaulted.  Defs.' R. 56(a)1 Stmt at ¶ 11; Pl.'s R. 56(a)2 Stmt at ¶ 11. However, following Richardson's arrest, the police investigation into the incident did not uncover any further exculpatory evidence beyond Richardson memorializing his accusations against Binns in a sworn statement.  See Statement of Jewu Richardson. Binns, however, did the same, signing a sworn statement that it was Richardson who had attacked her.  See Statement of Candice Binns.  Faced with contradicting sworn statements from the two parties directly involved in the incident, the court cannot conclude that it was "'manifestly unreasonable'" to move forward with prosecuting Richardson.  Tompkins, 50 F. Supp. 3d at 435 (quoting Jean v. Montina, 412 F. App'x 352, 354 (2d Cir. 2011)).

In his Memorandum, Richardson also stresses that Mills' investigation was inadequate.  See Pl.'s Mem. at 14-15.  That may be so.  It is certainly concerning that Mills did not even listen to the 911 calls Richardson made or investigate what plaintiff argues are discrepancies between the police report and Binns' sworn statement.  Id. at 14-15; Dep. of Edward Mills at 10.  However, in the malicious prosecution context, "an

officer" generally "has no duty to investigate exculpatory defenses." <u>Cafasso v. Nappe</u>, No. 3:15-CV-920, 2017 WL 4167746, at *7 (D. Conn. Sept. 20, 2017).[10]  Nor is there any evidence in the record upon which a reasonable jury could conclude that Binns "had a history of making false accusations that could be discovered with reasonable effort or . . . [had] made inconsistent statements" to the police, which some District Courts have held could trigger a duty to investigate further.  <u>McCaffrey v. City of New York</u>, No. 11 Civ. 1636, 2013 WL 494025, at *10 (S.D.N.Y. Feb. 7, 2013).  Absent these factors – and given that the court has already concluded that the officers had arguable probable cause to initiate Richardson's arrest – the court also concludes the defendants had arguable probable cause to initiate his prosecution.

Accordingly, the court concludes that McMahon, Rivera, and Mills are entitled to qualified immunity as to Richardson's malicious prosecution claim.  The Motion for Summary Judgment is therefore granted as to Count Two and Count Four of the Complaint.

B.    <u>Municipal Liability</u>

Finally, defendant City of Waterbury has also moved for summary judgment on Count Five of Richardson's Complaint, which alleges municipal liability pursuant to Connecticut General Statutes section 52-557n.  As Richardson concedes, his claim here is contingent on a finding that the defendant officers were liable in the first

---

[10] The Second Circuit has articulated an exception to this general rule "in cases involving prolonged detentions."  <u>Cafasso</u>, 2017 WL 4167746, at *7.  That exception does not apply here, however, as it "had been narrowly construed to involve situations where a law enforcement official has mishandled or suppressed readily available exculpatory evidence, which resulted in the plaintiff's unreasonably long incarceration."  <u>Id.</u> (internal quotations and citations omitted).  To meet the requirements for this exception, "a plaintiff must show his claim of innocence is 'readily-verifiable.'"  <u>Id.</u>  That is not the case here.

instance.  See Pl.'s Mem. at 18-19.  "Because the Court has ruled, as explained above, that the individual Defendants are not liable to the Plaintiff" for false arrest and malicious prosecution, the City of Waterbury has "no liability pursuant to Conn. Gen. Stat. 52-557n."  Hoyos v. City of Stamford, No. 3:19-CV-01249, 2021 WL 4263180, at *18 (D. Conn. Sept. 20, 2021).

Defendants' Motion for Summary Judgment is therefore granted as to Count Five of the Complaint.

## V.    CONCLUSION

For the reasons stated above, defendants' Motion for Summary Judgment is granted as to all counts.  The Clerk is instructed to close this case and enter Judgment in favor of the defendants.


**SO ORDERED.**

Dated at New Haven, Connecticut this 25th day of February 2022.


                                        /s/ Janet C. Hall
                                        Janet C. Hall
                                        United States District Judge